## Gay et al. v. Taylor et al.

*Charles Berry Howland, John Hemphill* and *Hazleton Mirkil*, for plaintiffs.
*Holding & Harvey*, for defendant.

WINDLE, J., September 28, 1932.—This is a bill in equity praying for an injunction restraining defendants from operating Sky Haven Airport, situate adjoining the country residences of three of the plaintiffs and in the vicinity of the hospital of the other plaintiff, on the ground that said operation constitutes a nuisance and also a continuing trespass. An answer and a replication were duly filed and the case was tried at the June Term, 1931. Requests for findings

of fact and briefs were presented and argument of counsel heard at the December Term, 1931, but not until February 1932 did counsel for the plaintiffs inform the court that he did not desire to file a supplemental brief as he had theretofore requested leave to do.

In addition to the plaintiffs of record as set forth in the above caption of the case, 11 persons owning land adjoining or in the vicinity of the airport certified in writing that they have read the bill of complaint and join in the prayer thereof.

## Findings of fact

1. The plaintiffs James H. Gay and Bonner D. Gay, his wife, are and have been since February 21, 1929, the owners in fee simple of an estate known as "Streamline Farm" in the Township of East Goshen, County of Chester, Pa., consisting of about 10 acres of land, upon which are situated the plaintiff's home and various outbuildings, including stables, barns, kennels, and other buildings incident to a country estate. The said property adjoins on the east the tract of land used by the defendants as an aviation field or flying field or landing field for aircraft, known as Sky Haven Airport. The house on the Gay property is about 500 feet from the five hangars and office building erected beside the landing area of the field. The dirt driveway from the West Chester-Paoli Road, a hard-surfaced road, closely parallels the Gay southern boundary line for about 300 feet, being about 400 feet south of the Gay building.

2. The plaintiff William I. Mirkil is and has been as to about 40 acres thereof since November 10, 1926, and as to the balance thereof since February 21, 1929, the owner in fee simple of an estate known as "Meadowlane Farm" in the said township, county and State, consisting of about 83 acres of land upon which are erected said plaintiff's home and various outbuildings including stables, barns, tenant houses, kennels and various other buildings incident to a country estate. The said property adjoins on the east the tract of land used by the defendants as an aviation field or flying field or landing field for aircraft, known as Sky Haven Airport. The house on the Mirkil property is about 1,400 feet from the landing area of the flying field.

3. The plaintiff Rush Hospital for Consumption and Allied Diseases, a corporation of the first class under the laws of the Commonwealth of Pennsylvania, is the owner in fee simple of a property in said township, county and State, consisting of about 227 acres of land upon which are erected numerous buildings constituting a hospital and sanitorium for the treatment of persons afflicted with and suffering from tuberculosis and diseases of similar kind and character. The said plaintiff acquired title to part of its property, to wit, 44 acres thereof, in 1902, and acquired title to the remaining 183 acres thereof in 1926. The said property of the said plaintiff is situate within a quarter of a mile of the said tract of land used by the defendants as an aviation field, flying field, or landing field for aircraft, known as Sky Haven Airport.

4. The Defendants Samuel W. Taylor, John P. Taylor, Mary T. Kern, and Harry F. Taylor are the owners of a certain tract of land in said township, county and State, containing about 65 acres of land, adjoining the aforementioned properties of Mirkil and Gay on the south and west.

5. The section surrounding the properties above mentioned is a mixed agricultural and country residential section, enjoying the peace and quiet of such a community. There are farms given over to farming and farms that are not operated as such but on which people have simply established country residences, as have the plaintiffs Mirkil and Gay. There are no industries of any substantial nature, a blacksmith shop, gasoline filling station, road stand, and dance hall being the only business ventures in that vicinity, the nearest of

which, the filling station, road stand, and dance hall, is about one-half mile from the Mirkil and Gay properties. Until the defendants established the airport in question, plaintiffs, including the Rush Hospital, enjoyed the uninterrupted peace and quiet of their estates, subject only to the noises usually incident to country life.

6. Plaintiffs have made substantial improvements for residential and, in the case of the hospital, for curative purposes on their properties, Mirkil having built among other things an outdoor swimming pool and facilities for trap shooting. Plaintiffs Mirkil and Gay occupy their properties the year through as residences, and the Rush Hospital maintains on its premises at all times a hospital or sanitorium for the treatment of tuberculosis.

7. On or about October 1, 1929, subsequent to the acquisition of the above-mentioned properties by the plaintiffs, the defendants, Samuel W. Taylor, John P. Taylor, Mary T. Kern, and Harry F. Taylor leased to the defendant John D. Jacob the tract of land of 65 acres hereinabove referred to as being owned by them, upon which the latter subsequently established the aviation field known as Sky Haven Airport above mentioned.

8. On or about November 26, 1929, the State Aeronautics Commission of the Commonwealth of Pennsylvania, upon application of the defendant John D. Jacob for the rating and licensing of an airport to be known as "Sky Haven Airport", licensed the said Sky Haven Airport for the purposes of commercial flying excepting, however, that a license for said airport for the purpose of flight instruction of student pilots was refused. On or about May 6, 1930, the said airport was licensed for all commercial purposes.

9. Thereupon the defendant John D. Jacob proceeded to use the tract of land hereinabove described for all purposes of an airport and airplane flying field. Aircraft were invited and permitted to use said field, to fly over said field, and to fly over the land, estates, and buildings belonging to the plaintiffs and others; aircraft owned and operated by the defendant John D. Jacob and other individuals and corporations were landed on and flown to and from said field and were permitted to fly to and on and fly to and from said field and over the land, estates, and buildings belonging to the plaintiffs and others; the unmuffled engines of aircraft were tuned up and run with loud and unpleasant noises; various other acts of similar nature, including "stunts" in the air, were performed, all by the defendant John D. Jacob or at his invitation or instigation or with his sanction and permission on the aforesaid property leased by him, and over the land, estates, and buildings of the plaintiffs and others. The said defendant John D. Jacob still continues to use said tract of land for the purposes hereinbefore set forth and for the following additional purposes, that is to say, for the transient and permanent storage of aircraft hangars; for maintaining an airport equipped with airplanes, operators, instructors for the use of the public; for repairing, maintaining, overhauling, tuning-up, and general supervision of the various aircraft that at any time may come to the said airport, and for the flight instruction of student pilots.

10. In the course of the aforesaid use and operation of the airport and flying field, the defendant John D. Jacob, together with other corporations and individuals, continuously and constantly has operated and flown and continues to operate and fly over the land, estates, and buildings belonging to the plaintiffs and others and over the tract of land hereinabove described his aircraft and the aircraft owned by said other corporations and individuals, in such manner as to create and maintain in and about the plaintiffs' houses and grounds loud and unpleasant noises and to annoy the plaintiffs and worry members of their families and household, all of which disturbs the plaintiffs in the peaceful and quiet

enjoyment of their said estate, materially annoying and aggravating and injuring the ordinary sensibilities of the plaintiffs, their families, servants and members of their households, and the guests who frequently visit their said estates at their invitation, and in other ways deprives them of peace and quiet.

11. In the course of the aforesaid use and operation of the said airport and flying field, planes using Sky Haven Airport have operated and flown and continue to operate and fly over the tract of land belonging to the plaintiff Rush Hospital for Consumption and Allied Diseases, in such a manner as to create and maintain in and about the said plaintiffs' tract of land and buildings loud and unpleasant noises, to the great annoyance, worry, and injury of the said patients of the said plaintiff Rush Hospital for Consumption and Allied Diseases, and to the detriment of their health, and to the prejudice of the cure or amelioration of their peculiar diseases.

12. During ordinarily dry weather the dust raised by the automobiles using the private driveway into the airport and the dust blown by the propellers of the said aircraft is carried in large quantities over the property of the plaintiffs James H. Gay and Bonner D. Gay, and finds lodgment in the dwelling house of the said plaintiffs, to the great annoyance of the said plaintiffs and of their family, household, and guests.

13. In order to attract crowds of people to the said airport, the said defendant John D. Jacob maintained, or there was maintained at his instigation or with his permission, a powerful amplifier or loud speaker, whereby there was broadcast radio and phonograph music of all kinds and character, and announcements were made. This broadcasting was of such intensity that it was annoying, it aggravated and injured the ordinary sensibilities of the plaintiffs James H. Gay and Bonner D. Gay and others, their families, servants, members of their household, and guests and disturbed them in the peaceful and quiet enjoyment of their said estates. Said condition however was materially rectified prior to the trial.

14. On one occasion a canvas cover and cushion fell on the Gay property from the plane of the defendant Jacob, operating from said airport, while he was doing a stunt at the height of 3,000 feet.

15. The crowds attracted by the operation of the airport aforesaid constantly trespass on the lands of the plaintiffs James H. Gay and Bonner D. Gay and disturb the said plaintiffs in the peaceful and quiet enjoyment of their said estates.

16. The aircraft owned and operated by the said defendant John D. Jacob and owned or operated by other corporations and private individuals using the said airport at the invitation of the said John D. Jacob and with his permission and acquiescence, continually fly over the land, estates, and buildings of the plaintiffs James H. Gay and Bonner D. Gay and William I. Mirkil, at elevations of between 10 feet and 300 feet.

17. The operation of the airport in question, known as Sky Haven Airport, causes hurt, inconvenience and annoyance to the reasonable enjoyment of the lands and hereditaments of plaintiffs, and annoys and disturbs plaintiffs in the possession of their properties, rendering the ordinary use and occupation thereof physically uncomfortable to said plaintiffs.

## Discussion

The industry or art of aviation is, of course, in a state of development. It is desirable that every proper aid and assistance to the growth and betterment thereof be given in order that it may fulfill its promise to the commerce of the country in time of peace and to national defense in time of war. However,

until legislative bodies have conferred such powers on them, those engaged in that industry are no more privileged to infringe on the rights of others than anyone else and they must be held to the same rules of conduct in their operations as individuals engaged in different and less glamorous pursuits. As sympathetic as we may be to foster and develop this new science, we may not confer upon it and its followers authority to do things not permitted in others. That may be done by the legislature but not by the courts, and until the former body has acted, the latter are unable to enlarge the powers referred to. Consequently, the defendants here are endowed with no special privileges merely because they are engaged in operating an airport and in that light have we considered them.

Nor does the license granted by the State Aeronautics Commission to Sky Haven Airport on the application of John D. Jacob, defendant, authorize him to commit a private nuisance in the operation of the airport. That is the thought in the minds of the commission as expressed in a report by them filed November 26, 1929, in which they say:

"The State Aeronautics Commission, under authority granted to it by law, is concerned with the question as to whether or not Sky Haven Airport is sufficient in size and equipment to make it adequate and safe for the landing and taking off of aircraft. This airport is an all-way landing field of approximately 2200 feet by 1500 feet in effective landing area. The landing area is sufficient for the landing and taking off of all civil aircraft now used within the Commonwealth of Pennsylvania.

"The protest filed raised the question of nuisance. It is contended that the operation of aircraft from this airport will be prejudicial to surrounding property and annoying to property owners in the immediate neighborhood. The protestants have an adequate remedy provided by law, which is a bill in equity filed in the courts of Chester County. That remedy has not been taken from them by the 'Aeronautics Act' nor has the aeronautics commission been given authority to consider the question of nuisance. Therefore, the aeronautics commission has filed and noted the protest but cannot determine the question of nuisance raised therein."

The report then continues as follows:

"1. That Sky Haven Airport complained of is adequate and properly qualified and safe for the landing and taking off of aircraft.

"2. That Sky Haven Airport with its present landing area and equipment is adequate and properly qualified and safe for commercial flying.

"3. That Sky Haven Airport with its present landing area shall not be used for flight instruction of student pilots."

An order granting a license in conformity with said findings was granted on the same day.

The thought expressed above is clearly correct. The license does not and does not pretend to confer on the proprietor of the airport the right to operate it in a manner that would constitute a private nuisance—indeed it could not do so. It merely says that the field in question is adequate, safe for landing and taking off of planes, and that the equipment thereof is suitable. Further than that it does not and could not go. The Danville, etc., R. R. Co. v. Com., 73 Pa. 29, cited by defendants to support a contrary view, is not controlling. There the legislature by statute authorized the railroad company to appropriate so much of the public road as was necessary for its purposes and the portion taken did not exceed the width fixed by law. The court held that the taking in pursuance of law cannot be a public nuisance. That is a very different situation from the one here presented, and the decision does not compel us to hold that defendants are licensed to commit a private nuisance with impunity.

"We deem the true rule, under the Fifth Amendment, as under state constitutions containing a similar prohibition, to be that while the legislature may legalize what otherwise would be a public nuisance, it may not confer immunity from action for a private nuisance of such a character as to amount in effect to a taking of private property for public use": Richards v. Washington Terminal Co., 233 U. S. 546, 553.

Nor does the fact that the State Aeronautics Commission has defined navigable air space in such a way as to include all air space contiguous to licensed airports necessary for the purpose of taking off and landing any given type of aircraft in normal ascent or descent deprive persons in the position of these plaintiffs of the right to complain of objectionable operation of planes over their properties and to obtain a restraining order against those established to be committing nuisances. The pronouncement of such a definition does not take away from plaintiffs any property rights that they theretofore had. It does not say that planes may operate in any navigable air space in any locality and in any manner without regard to the rights of other people.

It is true that the effect of the matters complained of "upon persons of ordinary health, normal or average sensibilities and ordinary tastes and habits and modes of living" is the test in determining what is and what is not a nuisance. However, the individual plaintiffs in this case and their witnesses fall within that category. Certainly they did not appear on the witness stand and from the manner in which they testified to be persons of unduly "delicate or dainty habits of living or fanciful or fastidious tastes," or persons who are "delicate, invalid, afflicted with bodily ills or abnormal physical condition, of nervous temperament or peculiarly sensitive to annoyances or disturbances of the character complained of." No allowance, therefore, need be made on that score.

The defense of laches advanced by defendants in section 111 of their brief cannot prevail. The lapse of time before proceedings looking to the abatement of the nuisance alleged was not unduly great under all the circumstances. Counsel for defendants states orally that Mirkil called to see him on August 7, 1930, complaining of the operation of the airport and that he was persuaded to postpone the institution of formal legal proceedings against defendants at that time, with the assurance, however, that no advantage would be taken by defendants of any delay beyond that date. Consequently, for the purposes of laches, August 7, 1930, is the date to be considered as the one upon which action to abate the nuisance alleged was taken. From the testimony it is obvious that although a license was granted to this airport on November 26, 1929, the full extent of the annoyance was not apparent until warm weather, when plaintiffs desired to have the doors and windows of their houses open, to sit on their porches and lawns and to use the swimming pool referred to. Then, and not until then, was there full realization of the magnitude of the disturbances. The noise, the dust, the visitation of crowds and apprehension of danger then made themselves felt as they had not in cooler weather. After enduring the situation for part of one summer, plaintiffs took action to protect their rights in the matter. We do not think they were too late.

Plaintiffs seek relief on two grounds: First, that the acts of the defendants constitute a private nuisance; and, secondly, that they are continuing trespasses. We will discuss the question of nuisance first.

A nuisance is "anything which causes hurt, inconvenience or annoyance to the lands, tenements or hereditaments of another, or to the reasonable enjoyment of the same": Wallace, Trustee, v. Auer, 10 Phila. 356; or "that which annoys and disturbs one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable to him": Tuckachinsky v.

Lehigh & Wilkes-Barre Coal Co., 199 Pa. 515. It has also been defined as "any thing that unlawfully hurts, annoys or causes inconvenience to another": Crawford v. Atglen Axle & Iron Mfg. Co., 1 Chest. Co. R. 412. As an airport is not a nuisance per se the operation thereof must come within the terms of the above definitions before is can be classed as a private nuisance as plaintiffs here seek to have done. Whether or not it is being properly operated as an airport or whether its operation constitutes only a reasonable use of the property in question is not controlling. The question is whether or not, no matter how it is operated or how reasonable such use of the real estate may be, it does constitute a nuisance to the plaintiffs as nuisance is above defined.

Four distinct elements of nuisance are alleged by the plaintiffs as the basis for the relief sought: Noise, dust, congregation of crowds, and apprehension of danger. The noise referred to is the noise of the planes taking off, landing, and in full flight over the properties of Gay and Mirkil, and in full flight over the Rush Hospital, and the noise of the loudspeaker installed in the office building at the landing field. This element is common to all plaintiffs, though of less intensity at the Rush Hospital, which is further removed from the field than the others.

The annoyance caused by dust is felt only by the plaintiffs Gay and their household and guests. That dust arises largely if not altogether from the unimproved private driveway into the airport which leads from the hard road nearby across a field to the landing field itself. Some of it is stirred up therefrom by the propellers of planes on the ground headed in a certain direction. The drive is used for no other purpose than to afford ingress and egress to and from the port and was established by defendants for that purpose. It runs along close by the south boundary line of the Gay property and about 400 feet from the dwelling. Persons visiting the airport use it, driving automobiles over it and raising clouds of dust complained of. The landing area, it appears from a preponderance of the testimony, is well sodded except possibly for two small patches, and but little if any dust emanates from it.

The congregation of crowds affects only the plaintiffs Gay. Those crowds are naturally and purposely attracted by the airport and overrun the Gay property, seeking many favors there in regard to the use of the telephone and toilets and using their private driveway for their cars.

The apprehension of danger is common to all plaintiffs, though probably not of great concern to the hospital. However, by reason of the low altitude at which the planes fly over the Mirkil and Gay properties, that apprehension is very real to them.

There can be no question that the noise of planes warming up, sometimes at early hours in the morning, and of those flying at such low altitudes as testified to over the properties of Mirkil and Gay is very objectionable and annoying. Frequent flights of a few minutes' duration are made, especially on Saturdays, Sundays, and holidays, just when plaintiffs are particularly anxious to enjoy the peace and quiet of their country homes. By reason of the direction of the prevailing winds, many of those planes in landing cross the line fence on the east side of the landing field, being the line fence on the west side of the Mirkil and Gay properties, from 10 to 25 feet above the ground, having glided down at a 7-to-1 angle over the properties in question for a distance of nearly a thousand feet, with engines throttled down but frequently backfiring or racing unmuffled. Others, in the minority, take off with motors roaring, likewise without mufflers, gaining altitude at about the same angle as when descending and only a trifle higher than when coming down. Whether taking off or landing, they pass the Gay porch about on a level with the eyes of one sitting thereon

and go approximately midway between the dwelling of Mirkil and Gay, which are 1400 feet apart. Mirkil testified also that the planes frequently passed about 50 feet over his house—not necessarily, it seems, while taking off or landing—sometimes swooping down close over his guests using the swimming pool and shooting trap, and Gay testified to the same effect as regards his dwelling. The noise was described, among other things, as "terrific," as frightening children, and as so loud as to interfere with conversation and the use of the telephone in both dwellings. The Rush Hospital complained that the noise of the planes flying low over its restrooms, after requests not to do so made to defendant Jacob, disturbed and upset the patients there. Other witnesses living at greater distances described the noise of planes in full flight over their farms. The defendants endeavored to refute the statements of plaintiffs and their witnesses, but their testimony was largely negative, being to the effect that Jacob and his pilot, Lynch, had not been guilty of the things complained of and that orders had been given by Jacob to his employes not to fly over the Rush Hospital building and not to do certain things objected to. Jacob testified, however, that privately-owned planes flew as they pleased, which indicates that he has no control over them and their operation, and doubtless the same is true of visiting planes. The fact that the occurrences testified to by plaintiffs had actually taken place was not denied and must be considered as true. Further, whether or not Jacob or his pilot did the acts complained of is by no means controlling. If others, attracted to this locality by the presence of the airport, bring their planes there, store them there, and operate them out of said port, or simply use the field occasionally for landing purposes, and while so doing commit objectionable acts amounting to a nuisance or nuisances, the airport must shoulder the responsibility and its operation may be enjoined.

Defendants called witnesses who testified that the noise from planes in flight over their properties was not objectionable. However, most of those who so testified lived at such a distance from the airport that the planes were not taking off or landing over their places but presumably had gained altitude proper for flying over such ground. Admittedly, the noise from planes so flying would be much less than from those ascending or descending and would not be nearly so disturbing. However, certain witnesses for plaintiffs living at some distance from the airport testified that planes flying over their homes after having gained altitude were a source of annoyance.

The noise from the loudspeaker complained of by plaintiffs living adjoining the airport had been materially lessened before the trial of the case. In comparison with the noise from the planes it is now almost inconsiderable and the weight that it adds to the objections of plaintiffs is little, if any.

The dust complained of by Mr. and Mrs. Gay undoubtedly constitutes a real annoyance. It is caused chiefly by traffic over the dirt driveway to and from the landing field, which is used by spectators attracted by curiosity as well as by customers and pilots and employes of the port, who drive over it in automobiles. The road in front of the Gay property is of hard-surfaced macadam and no dust comes therefrom at all. The dust raised by the traffic over the dirt driveway, as above described, is carried by the wind and the blast from propellers of planes onto and into the premises and dwelling house of the Gays. Because thereof the windows on the side of the house facing the driveway and the airport, being the windows in the living room, dining room, hall, the owners' bedroom, a guest room, and one bathroom, must be kept closed—an intolerable condition to contemplate in hot weather—if the house is to be kept clean and free from dust. Unless all the windows are kept shut the house must be dusted twice a day. Less dust, if any, it seems, comes from the landing field, as with

the exception of two small patches the field is apparently well sodded. However, defendants must assume responsibility for raising the dust complained of, whether it comes from the driveway referred to or is stirred up in the landing field by the blast of air from the propellers of planes warming up or taxiing over the ground.

The attraction of crowds of people is also complained of by the plaintiffs Gay, who testified as to their objectionable and annoying conduct on plaintiffs' premises. That the airport does attract people of course is not denied. It is intended to. Persons are invited and urged to come. The loudspeaker was operated, among other things, for that purpose. It seeks customers for the short flights described and students to teach how to fly. The more persons who come to the field the more likelihood is there of the defendants making money. It has been held that a "clear case of nuisance is established in the collecting of the crowd alone": Walker v. Brewster, L. R. 5 Eq. Cas. 25, 34; but under somewhat different facts than are here presented. However, it cannot be doubted that the overrunning of the Gay property by the crowds under consideration and the use by members thereof of the barn for "toilet facilities" and of the driveway for parking and turning cars and the requests to use the telephone testified to are most annoying and disturbing.

The apprehension of danger arises largely from the low altitude at which the planes are flying over the Gay and Mirkil properties, as has been pointed out above. No matter how careful pilots and mechanics may be, planes do develop engine or other trouble and do get out of control and crash to the ground. This is a matter of common knowledge. Because of it laws and regulations require flying at sufficient altitude to permit pilots if possible to make emergency landings when something goes wrong, not only to save the pilot and his passengers but also to protect the lives and property of people on the ground. Stunts over crowds are prohibited. If one of the planes mentioned in Mirkil's testimony as swooping down on his swimming pool and guests enjoying it had been unable to swoop up again, serious injury and damage might have been done to persons and property. Even the planes ascending and descending and in full flight may cause injury, as appears from the fact that a cushion and canvas cover dropped from one at an elevation of 3,000 feet. It is the fear of such injury and damage that plaintiffs here complain of. It appears to be well founded and to be due practically altogether to the operation of the airport in question—the transport planes traveling at great altitudes do not engender it.

A careful consideration of the testimony in this case leads to the conclusion that the elements of nuisance above referred to are established and that the operation of the airport is responsible for the noise, the dust, the crowds, and the apprehension of danger. We believe that each one is most objectionable, especially to persons who have sought the peace and quiet of the farming and agricultural community under consideration to establish their homes and bring up their children. Whether any of these elements taken alone would constitute a nuisance it is not necessary to determine. We have no doubt, however, that, taking them all together, they do constitute a nuisance; they do create a situation which at least plaintiffs Mirkil and Gay are not called upon to tolerate— a situation which in a community of the character surrounding the airport annoys and disturbs plaintiffs in the possession of their property, rendering its ordinary use and occupation physically uncomfortable, and which is restrainable at the instance of private individuals substantially and materially injuriously affected by it, as are these plaintiffs, or some of them. Having every consideration for aviation and its proper encouragement and development, we can reach no other conclusion. As we have said, the courts may not enlarge per-

sonal or property rights: that is a matter for the legislature. Finding the facts as above, as we feel constrained to do by a fair preponderance of the evidence, and applying the law thereto as we understand it at the present to be, we have no hesitation in concluding that the operation of the airport in question must be enjoined at the instance of these plaintiffs.

This conclusion is in conformity with the case of Swetland et al. v. Curtiss Airports Corp. et al., 55 F. (2d) 201, decided December 30, 1931, in United States Circuit Court of Appeals, Sixth Circuit. The case as decided in the United States District Court, Northern District of Ohio, was cited by defendants in support of their contention, as that court refused the injunction prayed. However, on appeal the circuit court of appeals reversed and granted the injunction on the ground that the operation of the airport in question constituted a private nuisance. In that case plaintiffs owned residences on one side of Richmond Road in the Village of Richmond Heights, Ohio, and the defendants subsequently bought property on the other side of said road, immediately opposite plaintiffs, and constructed an airport with hangars and equipment, from which frequent flights were made, and arranged parking space for automobiles. The distance from the road to the nearest point of the field was 500 feet and to the hangars and fairways from 600 to 1200 feet. The residences of plaintiffs were from 250 to 300 feet west of the center of the road, making the distance from said residences to the hangars and fairways about 750 or 800 feet to 1450 or 1500 feet. (In the case at bar, the hangars are 500 feet away from the Gay residence and the landing area 1400 feet from the Mirkil house, to use Jacob's figures.) The opinion of the circuit court of appeals says, in part (p. 203): "Take-offs and landings are required to be made 'up-wind,' and, while the prevailing wind is neither east nor west, when there is a wind from either of these directions there will necessarily be much flying over plaintiff's property, and often it will be at a much lower altitude than 500 feet. The plaintiffs will undoubtedly suffer much annoyance from the noises made by this low flying and the warming up, taking off, and landing of the æroplanes on the field." (In the present case the prevailing winds are such that by far the most of the taking off and landing is over the properties of Gay and Mirkil.) That opinion then goes on as follows: "The defendants have the right to establish airports, but they cannot lawfully establish one at a place where its normal operation will deprive plaintiffs of the use and enjoyment of their property. Ross v. Butler, 19 N. J. Eq. 294. . . . In Baltimore & Potomac R. R. Co. v. Fifth Baptist Church, 108 U. S. 317, . . . it was said: 'That is a nuisance which annoys and disturbs one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable to him. For such annoyance and discomfort the courts of law will afford redress by giving damages against the wrongdoer, and when the cause of the annoyance and discomfort are continuous, courts of equity will interfere and restrain the nuisance'—citing Crump v. Lambert, L. R. 3 Eq. 409." Further reference to this case, so similar on its facts to the one under consideration, is unnecessary. While the decision is not binding on us, nevertheless it is entitled to great respect and is one which we do not hesitate to follow.

The case decided in Massachusetts, referred to by counsel on both sides in their briefs, Smith et al. v. New England Aircraft Co. Inc., 270 Mass. 511, 170 N. E. 385, is differentiated from the present case on its facts. There the flights were largely over timber and woodlands. The court expressly says: "The noise from planes flying over plaintiffs' land does not materially interfere with their physical comfort. There was no evidence in this case that either the plaintiffs, their guests or any member of their household had suffered from

fear or fright by reason of airplane flights over their land." It was held, therefore, that there was no nuisance.

In view of the above it is not necessary to decide the question of trespass raised. However, an examination of the authorities, few as they are, regarding flights by airplane, indicates that the maxim "cuius est solum ejus est usque ad coelum" no longer is strictly adhered to, and that invasions of the air space over one's real property are trespasses only when they interfere with a proper enjoyment of a reasonable use of the surface of the land by the owner thereof. If that is correct, repeated trespasses of this character would, it seems, constitute a private nuisance and be restrainable as such. If the flights were so high or of such a character as not to disturb the owner of the property in his use and enjoyment thereof, they would not be objectionable either as trespasses or a nuisance, whereas if they did do so they would not only be trespasses but would constitute a nuisance. If this view of trespass by airplane is correct, defendants here, we believe, have committed and are committing continuing trespasses on the properties of Mirkil and Gay at least and possibly on the Rush Hospital property, in that their flights interfere with the proper enjoyment of a reasonable use of the surface of those premises, and on that ground also could an injunction be issued. However, we base our decision in this case on the ground of nuisance which, after all, as above suggested, may be drawing a distinction without any real difference. . . .

### Opinion sur exceptions to adjudication

WINDLE, J., December 27, 1932.—Plaintiffs filed this bill in equity seeking to enjoin the operation by the defendants of an airport known as Sky Haven Airport on property of certain of the defendants adjacent to the premises of plaintiffs, in East Goshen Township, Chester County, on the ground that said operation constituted a private nuisance to plaintiffs and also resulted in continued trespasses over their premises. An adjudication was filed in which it was found as a fact that the nuisance complained of did exist and a decree was entered restraining defendants from operating said airport on the property in question. To that adjudication defendants have filed exceptions which are directed to the decree, to certain findings of fact, statements made in the discussion of the case, and the conclusions of law.

In defendants' brief and in the oral argument counsel did not discuss the exceptions separately but advanced the proposition that the chancellor should not have enjoined the operation of the airport altogether but should have enjoined only those operations in connection therewith that constituted or caused the nuisance complained of, suggesting that the prohibition should have been directed against the causes of the dust, the noise, the congregation of crowds and the apprehension of danger testified to and found by the chancellor to be the elements of the nuisance occasioned by the airport. It was also suggested that the height of flight over lands of plaintiffs be limited to not less than a certain distance on the theory that higher flights would not constitute trespasses, although the chancellor did not decide the matter on the basis of continued trespasses of that nature but, as definitely appears, on the ground that a private nuisance had been proved to exist by the evidence as to the operation of the airport separate and apart from any question of trespass over the property of plaintiffs. It was further suggested orally by counsel that the hangars and landing area might be moved so that certain of the noises complained of might be diminished or eliminated, that the private roadway that gave rise to the dust and, to some extent, the presence of crowds on the Gay place might be relocated, and that planes could be flown at a height of not less than 500 feet,

thus lessening in some degree the noise and apprehension of danger and eliminating any question of trespass, and that the decree should be so modified as to permit defendants to do those things and thus operate the airport in a manner which would by reason thereof no longer be objectionable.

With this proposition we cannot agree. On the trial it was not suggested that the airport could be operated in an unobjectionable manner, and it is apparent from the evidence that it cannot be. True, in certain cases decided in our Supreme Court the operations of businesses that were alleged to constitute nuisances, notably garages, have been regulated by decrees of court so as to eliminate the features that caused the nuisances and the defendants permitted to conduct their businesses, if they could, without doing those things. Here however such a course is impossible. If the airport could be operated in an unobjectionable manner, surely after the complaint made by plaintiffs to counsel for defendants in August 1930 steps would have been taken to do so. It may be that they were, but if so they were not efficient to accomplish that purpose. The noise of the engines of the planes on the ground and in the air cannot be, so far as the evidence indicates, eliminated or materially reduced. Due to the size and shape of the field and the direction of the prevailing winds it does not appear practical to move the landing area thereon to any point that would not impose the noise complained of on some of the plaintiffs or those who joined in the prayer of the bill. The same is true of the congregation of people attracted by the operation of the port and the apprehension of danger. It may be that the dust could be eliminated—though it was not even after complaint made as above—but that is only one element of the nuisance complained of.

In regard to the height of flight over complainants' lands as bearing on the question of continued trespasses, it is apparent from the evidence that to limit said height to not less than 500 feet would be an empty gesture. Planes of the type now commonly operated and using this airport could not possibly gain altitude in ascending or stay high enough in the air on descending to keep 500 feet above plaintiffs' or any other adjoining properties if the testimony is to be believed. Planes ascend and descend on an angle of approximately 1 to 7. To gain an altitude of 500 feet they would have to fly a horizontal distance of about 3500 feet, and the airport in its longest dimension, which is at right angles to the direction of the prevailing winds, is only 3600 feet long, thus leaving only 100 feet on the ground for the plane to travel before taking off, which is entirely inadequate. The greatest dimension of the field in the direction of the prevailing wind is about 1800 feet. To impose any such restriction as that under discussion would be decreeing a vain thing, which a court of equity will not do.

In our opinion, an airport cannot be operated on the property in question without being a nuisance to these complainants. The testimony clearly indicates that its operation was a nuisance. That operation must be enjoined as a whole, there appearing in the evidence no ground for finding that in any other way can the objectionable character thereof be eliminated: Swetland et al. v. Curtiss Airports Corp. et al., 55 F. (2d) 201, in which the court, apparently confronted with a similar situation, says:

"The record does not contain sufficient evidence to determine whether other parts of the property could be used without seriously interfering with the plaintiffs' enjoyment of their properties. That question we leave open for consideration by the trial court upon the remand of the case. It is sufficient for present purposes that the defendants should be enjoined from operating the airport as now located."

The exceptions filed raise no other questions not considered, discussed and passed upon in the adjudication. No good purpose can be gained in any further

discussion thereof here. Nothing has been called to our attention to cause us to make any change therein. They will be dismissed.

Exceptions dismissed. The following will be entered as the

### Final decree

And now, December 27, 1932, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows:

The operation of the airport known as Sky Haven Airport on the property owned by the defendants Taylor and Kern in East Goshen Township, Chester County, Pa., is hereby enjoined and all the defendants are restrained from using said property as an aviation field or flying field or landing field for aircraft and from carrying on thereon any operations incident to such use of said field. The costs will be paid by defendants.